Filed 10/27/15  P. v. Tanner CA3

## NOT **TO** **BE** **PUBLISHED**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# THIRD APPELLATE DISTRICT

## (Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C076627 |
| Plaintiff and Respondent, | (Super. Ct. No. 13F00474) |
| v. | |
| FREDERICK TANNER, | |
| Defendant and Appellant. | |

Defendant Frederick Tanner challenges his conviction for criminal threats, contending (1) there is insufficient evidence to support the conviction; (2) the trial court erred in excluding evidence and limiting cross-examination and his counsel was ineffective for failing to object to that exclusion and limitation; (3) the prosecutor committed misconduct and defense counsel was ineffective for failing to object; and (4) these errors were cumulatively prejudicial.  Defendant also contends (5) the trial court erred in failing to stay punishment on a burglary conviction because it arose from the

1

same course of conduct as the criminal threats and was motivated by the same intent and purpose. We will affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

At about 10:45 a.m. on January 19, 2013, Eisar Askari and Sokung Swing were preparing to open the restaurant where they worked. As Askari came into the restaurant after dumping the fryer oil, he heard someone in the office. When he opened the office door, he saw defendant inside with Swing's purse in one hand and a "bunch of . . . cash" in the other. When asked why he was there, defendant responded that he wanted to use the restroom. Askari then asked why defendant had Swing's purse; defendant responded by dropping the purse and punching Askari in the face. Defendant continued hitting at Askari, and Askari implored Swing to call 911, which she did.

Askari told defendant to leave, but defendant continued punching Askari until he was pinned against a wall of the office, leaving a hole in the sheetrock the size of Askari's head. It appeared defendant was attempting to reach for scissors or a knife on top of the desk in the office, so Askari tried to hold defendant's hands away. In the meantime, defendant kept hitting Askari in the head and kneeing him in the legs.

Askari and defendant fell through the open office door and landed on the ground with defendant on top of Askari. Swing then went to the neighboring business to ask for help. Defendant, sitting on Askari's midsection, then "grabbed [Askari's] head and smashed [it] like six, seven times . . . on the ground" until Askari "passed out." While defendant was hitting Askari's head against the ground, defendant repeated "I'm going to kill you" two or three times before Askari "blacked out." Askari was scared and believed defendant would kill him.

When Swing returned, defendant was on top of Askari, who appeared to be unconscious, was not moving, and whose eyes were "bulged out." Defendant's hands

2

were around Askari's neck. Swing pulled defendant off Askari, pushed him to the ground, and tried to restrain him. As she did, police officers and men from the neighboring business arrived. Askari testified he woke as defendant was being placed into handcuffs. Officers testified Askari was conscious and holding defendant on the ground when they entered.

An officer helped Askari into a chair, gave him water, and he began vomiting repeatedly. The officer questioned Askari, who she described as being excited, having watery eyes, animated, and "pretty upset." Another officer described Askari's demeanor as "visibly upset and scared." The owner of the neighboring business also testified that Askari "appeared scared" when he arrived. Later, after defendant had been placed in the patrol car, Askari told him to "go get a job." Askari only worked part of his shift that day, leaving early because he was "shaking" and "still scared."

When the other officer searched defendant, he was in possession of a wallet belonging to yet another victim. The other victim had left his wallet, which had approximately $200 cash inside, on the front seat of his car at a car wash a few blocks from the scene of the burglary. When he received a telephone call from the police about a half hour later, he discovered that the wallet was missing. Officers returned the wallet, and all the money, to the victim.

Following a bifurcated trial, the jury found defendant guilty of burglary (Pen. Code, § 459—count one),[1] simple battery (§ 242 [a lesser offense for count two, which was charged as battery resulting in the infliction of serious bodily injury on a person (§ 243, subd. (d))]), assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)—count three), criminal threats (§ 422—count four), and receiving stolen property (§ 496, subd. (a)—count five). The jury found not true the special

---

[1] Undesignated statutory references are to the Penal Code.

allegation that defendant had inflicted serious bodily injury during the commission of the assault, and found defendant not guilty of the charged battery causing serious bodily injury. The jury then found true that defendant had two prior convictions (§§ 667, 1170.12) and had served five prior prison terms (§ 667.5, subd. (b)).

The court found the two prior convictions were strikes and that the current conviction for criminal threats was also a strike. The trial court sentenced defendant to an indeterminate term of 25 years to life for criminal threats and a consecutive determinate term of 21 years four months, comprised of six years for burglary, one year four months for receiving stolen property, a stayed term of three years for assault, two five-year terms for prior convictions, and four one-year terms for prior prison terms.

## DISCUSSION

### 1.0  Sufficiency of the Evidence

Defendant contends there is insufficient evidence to support the necessary finding that Askari was in sustained fear because Askari lost consciousness either while or immediately after the threats were issued, and there was no evidence Askari was still afraid when he awoke. We disagree.

When a defendant contends there is insufficient evidence to support his conviction, we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence, i.e., evidence that is reasonable, credible, and of solid value, based upon which a reasonable trier of fact could find defendant guilty beyond a reasonable doubt. (*People v. Osband* (1996) 13 Cal.4th 622, 690.) We accord due deference to the verdict and will not substitute our conclusions for those of the trier of fact. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078.) Nor will we reverse the conviction unless it appears "that upon no hypothesis whatever is there

4

sufficient substantial evidence to support [the conviction]." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

To prove a criminal threat, among other things, the People must show "that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety . . . .' " (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228.) For purposes of this inquiry, fear is sustained if there is "evidence that the victim's fear is more than fleeting, momentary or transitory." (*People v. Culbert* (2013) 218 Cal.App.4th 184, 190 (*Culbert*).) Even if the encounter lasts only a minute, if the victim in that situation believes his or her death is imminent, he or she suffers sustained fear. (*Id.* at pp. 190-191, citing *People v. Fierro* (2010) 180 Cal.App.4th 1342, 1349.)

Defendant, citing *In re Ricky T.* (2001) 87 Cal.App.4th 1132, argues that because Askari's fear "did not last 'beyond the moments of the encounter,' " his fear was not sustained. We find *Ricky T.* involves a sui generis factual situation and is inapposite. Ricky T. found himself locked out of the classroom, and when a teacher opened the door for him, the door accidentally hit Ricky in the head. (*Id.* at p. 1135.) Ricky "became angry, cursed [the teacher] and threatened him, saying 'I'm going to get you.' " (*Ibid.*) The teacher reported that he " 'felt threatened' and . . . ordered [Ricky] to report to the school office," but the incident was not reported to the police until the following day. (*Id.* at p. 1140.) The teacher properly sent Ricky to the principal's office after Ricky "uttered intemperate, disrespectful remarks to [his teacher] in the presence of a classroom full of students" where "this mouthing off or posturing was not designed to coerce [the teacher] to do or not to do anything," the teacher "admitted the threat was not specific" and there was no indication the teacher "felt fear beyond the time of the angry utterances." (*Ibid*.) On these facts, *Ricky T.* held the defendant's statement was "an emotional response to an accident rather than a death threat that induced sustained fear."

(*Id.* at p. 1141.) Thus, held the court, "[a]lthough what [Ricky] did was wrong, we are hesitant to change this school confrontation between a student and a teacher to a terrorist threat. Students who misbehave should be taught a lesson, but not, as in this case, a penal one." (*Ibid.*)

Here, defendant was in the midst of burglarizing the restaurant where Askari and Swing were working, before the restaurant was open, and was in the throes of a physical attack on Askari when the threats were made. Defendant threatened to kill Askari as he was smashing Askari's head into the ground. Askari testified he was scared and believed defendant was going to kill him. There is conflicting testimony regarding whether Askari actually lost consciousness as a result of his head hitting the ground and whether he was conscious when officers arrived. Nonetheless, the evidence was that he was still scared, shaking, and visibly upset when officers arrived and until they subsequently handcuffed defendant. Thus, whether Askari remained frightened after waking from unconsciousness or after he restrained defendant, his fear was "more than fleeting, momentary or transitory." (*Culbert*, *supra*, 218 Cal.App.4th at p. 190.) Accordingly, we conclude substantial evidence supports the finding that Askari had "sustained fear" as a result of defendant's criminal threats.

**2.0  Exclusion of Evidence**

2.1  Cross-examination of Witness

During cross-examination of a witness who had come from the business next door, the trial court sustained the prosecutor's hearsay objections to defense counsel's questions, "Did you ever hear [defendant] making threats to Mr. Askari?" and "Did you ever hear [defendant] saying anything to Mr. Askari? Defendant contends this ruling was prejudicially erroneous. We agree that the trial court's evidentiary ruling was incorrect. (See *People v. Fields* (1998) 61 Cal.App.4th 1063, 1068-1069 [" 'If a fact in controversy is whether certain words were spoken . . . and not whether the words were true, evidence

6

that these words were spoken . . . is admissible as nonhearsay evidence.' "].)  However, defendant did not raise this ground of admissibility at trial when the prosecutor objected or when the trial court sustained the objection.[2]  Therefore, he is generally precluded from raising this contention on appeal.  (*People v. Fauber* (1992) 2 Cal.4th 792, 854.)  Anticipating this circumstance, defendant also contends trial counsel was ineffective for failing to raise that ground of admissibility at trial.  We conclude defendant has not sufficiently shown prejudice to prevail on this claim.

To establish a claim of ineffective assistance of counsel, defendant must prove that (1) trial counsel's representation was deficient because it fell below an objective standard of reasonableness under prevailing professional norms and (2) the deficiency resulted in prejudice to defendant.  (*People v. Maury* (2003) 30 Cal.4th 342, 389; see *Strickland v. Washington* (1984) 466 U.S. 668, 686-687 [80 L.Ed.2d 674] (*Strickland*).)  "Prejudice is shown when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a

---

[2]  This issue was initially brought to the trial court's attention before trial when the People moved to "exclude any statement of the defendant, when offered by the defense, including any questions phrased by defense counsel with a statement allegedly made by the defendant" as hearsay.  Defendant argued the request was overbroad because "asking the defense witnesses and other witnesses about words that came from [defendant's] mouth" with reference to the criminal threats allegation would not be hearsay because they would not be offered for the truth of the matter stated.  The trial court *deferred ruling* until the question was asked, but stated: "Hypothetically, I don't see a problem with the question to a witness as to did you hear [defendant] say Y, X or Z as long as X, Y or Z is related to the actual [criminal threat].  At that point, you are probing the elements of the [crime] in terms of the verbal expression of a threat."  Then, during cross-examination of a witness who had come from the business next door, the trial court sustained the prosecutor's hearsay objections to defense counsel's questions, "Did you ever hear [defendant] making threats to Mr. Askari?" and "Did you ever hear [defendant] saying anything to Mr. Askari?  At that time, defendant did not object to the trial court's rulings, did not seek a sidebar conference, and did not otherwise argue the testimony was not hearsay because it was not being submitted for the truth of the matter asserted.

probability sufficient to undermine confidence in the outcome." (*People v. Williams* (1997) 16 Cal.4th 153, 215.)  If defendant makes an insufficient showing on either one of these components, his ineffective assistance claim fails.  (*People v. Holt* (1997) 15 Cal.4th 619, 703; see *Strickland*, *supra*, 466 U.S. at p. 687 [80 L.Ed.2d 674].)

Here, even if the witness had been permitted to testify that he did not hear the threats, there is no reasonable probability that that evidence would have led to a different result.  The timeline of events here establishes that Swing went next door to seek help while defendant was still attacking Askari.  An employee of the business followed Swing back to the restaurant immediately or almost immediately.  However, the witness in question, a contractor, who was working at the neighboring business, paused before heading to the restaurant because he did not want to become involved.  According to his testimony, when he arrived, Askari was on top of defendant, holding him down.  By the time this witness arrived, neither Askari nor defendant was hitting each other; they were both on the ground "at a standoff."  The evidence showed that the threats were made while defendant was slamming Askari's head into the ground, before Swing returned and certainly before this witness arrived.  Therefore, this witness's testimony that he did not hear the threat was not likely to result in a better outcome for defendant, so defendant cannot prevail on his ineffective assistance of counsel claim.

2.2  Video Clip

Defendant sought admission of a video clip that showed Askari walking around within five minutes of the officers' arrival.  The proposed purpose for the video clip was to undermine Askari's "credibility as a witness in terms of testifying to the nature and extent and severity of his injuries" and to disprove Askari's claim that he was "unconscious for five minutes and couldn't get up."  The trial court excluded the video clip as cumulative to other video clips that were admitted, finding that its probative value was outweighed by its likelihood to create a "substantial danger of undue prejudice,

8

confusion of the issues, and misleading the jury," and that it would be unduly consumptive of time. (Evid. Code, § 352.) Defendant contends the trial court prejudicially erred when it excluded the video clip, and contends defense counsel was ineffective for failing to seek admission of the clip as evidence Askari did not have sustained fear as a result of the threat. We conclude any error in the exclusion of the evidence for purposes of showing Askari was not seriously injured was harmless, defendant forfeited any claim the trial court erred in failing to admit the evidence for another purpose, and defendant has not shown ineffective assistance of counsel.

### 2.2.1 Trial Court's Exclusion of Evidence

"A trial court may exclude evidence under Evidence Code section 352 if its probative value is substantially outweighed by the probability that admission will unduly consume time, create a substantial danger of undue prejudice, confuse the issues, or mislead the jury. [Citation.] Cumulative evidence may be excluded on this basis." (*People v. Mincey* (1992) 2 Cal.4th 408, 439.) We review rulings pursuant to section 352 under the abuse of discretion standard (*People v. Hillhouse* (2002) 27 Cal.4th 469, 496), and reverse only if the trial court's ruling was " 'arbitrary, capricious or patently absurd' " and caused a " 'manifest miscarriage of justice' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124).

Defendant's proffered explanation for the admission of the excluded video clip was to demonstrate that Askari was not seriously injured. Even if the trial court erred in excluding the video clip, that exclusion was harmless because the jury found false the allegation that defendant had inflicted serious bodily injury in committing the assault of Askari and found defendant not guilty of the charged offense of battery resulting in the infliction of serious bodily injury on a person. Therefore, the jury ascertained, based on the admitted video clips and the testimony of defense witnesses and others that Askari was not seriously injured. As such, admission of this additional video clip for the

9

purpose proffered was not reasonably probable to result in a more favorable outcome for defendant. (See *People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103 [exclusion of some defense evidence does not impermissibly infringe on a defendant's right to present a defense, so harmless error standard enunciated in *People v. Watson* (1956) 46 Cal.2d 818, 836 applies].)

Additionally, to the extent defendant contends the trial court should have admitted the video clip for the purpose of showing Askari was not afraid of defendant, he has forfeited that contention by failing to raise it below. "[T]he proponent of evidence must identify the specific ground of admissibility at trial or forfeit that basis of admissibility on appeal." (*People v. Ervine* (2009) 47 Cal.4th 745, 783.) For, "[a] party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*People v. Partida* (2005) 37 Cal.4th 428, 435.)

### 2.2.2 Ineffectiveness of Counsel

As indicated above, to prevail on a claim for ineffective assistance of counsel, defendant must show not only that counsel's representation was deficient but also that defendant was prejudiced as a result of that deficiency. (*People v. Maury*, *supra*, 30 Cal.4th at p. 389; see *Strickland*, *supra*, 466 U.S. at p. 686-687 [80 L.Ed.2d 674].) "It is particularly difficult to prevail on an appellate claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009, italics omitted.)

Defendant contends "counsel was ineffective . . . when she failed to articulate to the trial court her theory that [the video clip] was relevant to prove Askari's lack of

10

sustained fear."  He argues counsel should have sought admission of the video clip because it "was closest in time to the incident and it showed plainly that Askari had no fear of [defendant] by that point in time."  However, "that point in time" was *after* officers had arrived, handcuffed defendant, and placed him in the rear seat of the patrol car.  To have sustained fear for purposes of a criminal threat charge, the fear need only be "more than fleeting, momentary or transitory."  (*Culbert*, *supra*, 218 Cal.App.4th at p. 190.)  Therefore, even if the video clip demonstrates that Askari's fear had dissipated once defendant was secured in police custody, the probative value of that evidence to determining whether Askari had sustained fear is quite low.  Furthermore, not only Askari, but the officers and other witnesses testified that Askari was scared when officers arrived on scene.  So, rather than argue Askari was not afraid, trial counsel presented the rational argument that Askari never lost consciousness and that the threats were never made, as no one else heard the threats and witnesses testified Askari was conscious when they arrived.  On these facts, we do not find trial counsel provided defendant ineffective assistance.

## 3.0  Prosecutorial Misconduct

Defendant contends the prosecutor committed misconduct by misstating the law during closing arguments, and that defense counsel was ineffective for failing to object. Defendant failed to object or to seek a curative admonition at the time of the alleged misconduct; therefore, he forfeited his claim of prosecutorial misconduct.  (*People v. Linton* (2013) 56 Cal.4th 1146, 1205.)  Nonetheless, we consider his claim on the merits to resolve his contention that trial counsel provided ineffective assistance by failing to object to the misconduct.  We conclude counsel did not render ineffective assistance because there was no misconduct on the part of the prosecutor.

The prosecutor presented the following argument in closing:  "Sustained fear means fear that—for a period of time that is more than momentary, fleeting, or transitory.

11

We have that. But in this case, even if the sustained time is sufficient, just in the initial moment when he's being told 'I'll kill you' and loses consciousness, that's enough time. [¶] Okay. But . . . all the evidence shows when he re-alerted and realized what was coming [*sic*] on and he became conscious again, he was still afraid, he was still shaking, he was very still vomiting, he was still a mess." Defense counsel did not object to this argument but, following the prosecutor's closing argument, the court and counsel had an off-the-record discussion in which defense counsel argued that the prosecutor's arguments regarding the delay in time between the incident and the admitted video clip were improper.

A summary of this off-the-record discussion was not placed on the record until after the jury began deliberations. At that time, defense counsel then argued it was improper for the prosecutor to seek exclusion of the video clip showing Askari walking around within five minutes of the officers' arrival and then to argue to the jury that there was a lack of evidence that Askari was walking around "right away." The court asked what remedy defense counsel was seeking, and she stated at the time of the sidebar conference she wanted to request to reopen her case before presenting her closing argument but, because the court said the side-bar "was just going to be put on the record and there was—you said we would talk about it after the fact, . . . that remedy is out the window. That's the remedy I would have preferred." The court asked counsel, "You would have had your case reopened after the [prosecutor] had already started his closing arguments?" Counsel responded that she did not know what else she could do. The court advised that counsel could have made an objection or sought a curative admission during the prosecutor's argument.

Ultimately, the trial court found the prosecutor's statement was "entirely consistent" with the evidence. The trial court also recounted that when it excluded the video clip as cumulative, it was working on the assumption that the video clip could not

12

be presented to the jury without the split screen also showing the irrelevant footage of defendant being placed into the patrol car.  It was only later that defense counsel presented the versions of the video clips without the split screen, and at that time defense counsel did not seek admission of the previously excluded clip.  Thus, the trial court concluded that at that point, there was no remedy the trial court could afford, and nor would defendant be entitled to one because there was no misrepresentation of the facts and no unfair argument.

In light of the trial court's ruling that there was no misrepresentation or unfair argument, it would appear that had defense counsel objected during the prosecutor's closing argument on that basis, such an objection would have been overruled by the trial court.  Moreover, the prosecutor did not misstate the law by arguing that Askari felt sustained fear even if he was afraid only while the threats were being made and until he fell unconscious as a result of defendant simultaneously slamming Askari's head into the ground.  (See *Culbert*, *supra*, 218 Cal.App.4th at pp. 190-191, citing *People v. Fierro*, *supra*, 180 Cal.App.4th at p. 1349 [even if the encounter lasts only a minute, if the victim believes his or her death is imminent, he or she suffers sustained fear].)  Therefore, defense counsel was not deficient in failing to raise the objection during the prosecutor's closing argument.  (*People v. Price* (1991) 1 Cal.4th 324, 387 [counsel's failure to make a futile or unmeritorious objection is not deficient performance]; *People v. Constancio* (1974) 42 Cal.App.3d 533, 546 ["It is not incumbent upon trial counsel to advance meritless arguments or to undertake useless procedural challenges merely to create a record impregnable to assault for claimed inadequacy of counsel."].)

## 4.0  Cumulative Error

Defendant contends these cumulative errors violated his Sixth and Fourteenth Amendment rights under the federal Constitution.  The only error we have found was the trial court's ruling on hearsay grounds that defendant could not question the witness

regarding whether he heard defendant threaten Askari. Even if we assume it was also error for the trial court to exclude the video clip, these two errors did not cumulatively deprive defendant of a fair trial. (See, e.g., *People v. Jurado* (2006) 38 Cal.4th 72, 127.)

## 5.0 Sentencing Error

Defendant contends that section 654 barred his punishment for burglary (count one) because his intent and objective in committing this offense was the same as his intent and objective in committing the criminal threat (count four), namely, "entering the restaurant to try to steal and to leave without being caught." We disagree.

"Section 654 precludes multiple punishment where an act or course of conduct violates more than one criminal statute but a defendant has *only* a single intent and objective." (*People v. McCoy* (2012) 208 Cal.App.4th 1333, 1338.) But, "if the evidence discloses that a defendant entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for the independent violations committed in pursuit of each objective even though the violations were parts of an otherwise indivisible course of conduct." (*People v. Perez* (1979) 23 Cal.3d 545, 551.) "A trial court's implied finding that a defendant harbored a separate intent and objective for each offense will be upheld on appeal if it is supported by substantial evidence." (*People v. Blake* (1998) 68 Cal.App.4th 509, 512.)

Where an offense is committed during an attempt to escape from the scene of another offense, "the courts analyze the evidence to determine whether all the offenses committed were part of the defendant's original plan or some were an afterthought or acts committed in response to unforeseen developments." (*People v. Vidaurri* (1980) 103 Cal.App.3d 450, 465.) In *Vidaurri*, section 654 did not preclude multiple punishment where the defendant entered a store with the intent to steal merchandise and, during his attempt to flee the scene, he subsequently assaulted bystanders and store employees in response to unforeseen circumstances—the approach of the store's security

14

guards.  (*Vidaurri*, at pp. 465-466.)  Similarly, in *People v. McGahuey* (1981) 121 Cal.App.3d 524, 528-529, the defendant stole a hatchet from a house where he was committing a burglary, and, on spying the homeowner's attempt to call the police, threw the hatchet at the homeowner through the window.  The court held the crimes could be punished separately because the intent to commit the assault was formed after the burglary was committed.  (*Id*. at p. 529.)

Here, in sentencing defendant for receiving stolen property (count five), the trial court stated the term for that offense was "to run consecutive to the term imposed under Counts One and Four [(criminal threats)] pursuant to . . . section 667[, subdivision] (c)(6) . . . .  [T]he offense charged in Count Five was not committed on the same occasion nor did it arise from the same set of operative facts as those underlying Counts One and Four."  Contrary to defendant's assertion, by finding that the "same set of operative facts" were involved in the burglary and criminal threat offenses, the trial court did not "recognize[] that the burglary, assault, and threats were incident to the overall objective of stealing and escaping successfully."  By imposing consecutive terms for the burglary and criminal threats, the trial court implicitly found that defendant harbored a separate intent and objective for each of these offenses.

On the facts before us, it does not appear defendant entered the restaurant with the intent to assault, batter, or threaten Askari.  Rather, he entered to commit burglary, and it was only when Askari interfered with the burglary that defendant formed the intent to commit the assault, battery, and criminal threats against Askari so that he could escape.  Therefore, substantial evidence supports the trial court's implied finding that defendant had separate intents and objectives in committing the burglary and criminal threats.  Accordingly, it was not error for the trial court to impose multiple punishments for these offenses.

15

## DISPOSITION

The judgment is affirmed.



      BUTZ        , Acting P. J.



We concur:



      MAURO       , J.



      RENNER      , J.